Ellie Riegel, OSB #221879
Assistant Federal Public Defender
Email: Ellie_Riegel@fd.org

Peyton Lee, OSB #164224
Assistant Federal Public Defender
Email: Peyton_Lee@fd.org

101 SW Main Street, Suite 1700
Portland, OR 97204
Tel: (503) 326-2123
Attorneys for Defendant

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:25-cr-00337-YY-1 |
| Plaintiff, | |
| v. | MOTION TO DISMISS |
| TRACY MOLINA, | |
| Defendant. | |

Defendant, Tracy Molina, through her counsel Peyton Lee and Ellie Riegel, respectfully

moves this Court for dismissal of all charges against her. Pursuant to Federal Rule of Criminal

Procedure 12(b)(1), a defendant "may raise by pretrial motion any defense, objection, or request

that the court can determine without a trial on the merits." *See United States v. Plascencia-*

*Orozco*, 852 F.3d 910, 920 (9th Cir. 2017). Ms. Molina is charged with violations of Title 41,

Code of Federal Regulations § 102-74.385, failing to comply with official signs and lawful

directions.

Page 1 Motion to Dismiss

The charges should be dismissed for four reasons. First, the government's arrest of Ms. Molina constituted an unreasonable time, place, and manner restriction on her speech in a public forum. Second, as applied to Ms. Molina, the regulation charged is overbroad because it criminalized Ms. Molina's protected First Amendment activity. Third, the regulation charged is vague because it allows for subjective and arbitrary enforcement, which has a chilling effect on protected speech. Finally, the regulation under which Ms. Molina is charged is invalid because Congress impermissibly delegated to the executive branch unconstrained authority to impose criminal penalties.

## BACKGROUND[1]

Ms. Molina is a dedicated activist who has been attending protests in Portland since at least 2018. She was raised in the Siletz Tibal Community in Oregon and has ancestry from the Xiximec and Nahua tribes of central Mexico. A member of the Native American Church, Ms. Molina strongly identifies with her Native heritage. Protest activity is a manifestation of her religious and cultural beliefs.

Since January 2025, Ms. Molina and other Indigenous people have been gathering peacefully outside of the ICE facility to protest increased federal immigration enforcement activity. Ms. Molina cares deeply about immigrant communities and views their experiences as intimately connected to her own Native heritage. Outside of the ICE facility, Ms. Molina often

---

[1] The factual background is based on the CVB tickets and documents provided by the government in discovery, except where otherwise noted. Ms. Molina does not stipulate to the accuracy of these facts, but adopts them as true for the purposes of the motions argument. Ms. Molina reserves the right to take contrary positions at trial.

prayed, danced, educated the public about Native American history, or practiced other customs shared by Indigenous people, including hanging tobacco ties on a nearby fence.

The charges that Ms. Molina faces stem from her protest activity at the ICE facility on three separate occasions. On all three occasions, Ms. Molina was cited for violating 41 CFR § 102-75.385. Each incident is addressed separately below.

First, on July 20, 2025, officers observed Ms. Molina, "along with other protesters, assembling near federal property at the front entrance." *See* Exhibit A, Federal Protective Services (FPS) Violation Notice, Citation No. E1764478, Pg. 2 (Statement of Probable Cause). As described in the Statement of Probable Cause, officers observed Ms. Molina at 7:29 pm. Officers provided warnings via a Long-Range Acoustic Device (LRAD) at 7:30 pm, 7:39 pm, and 8:14 pm. *Id*. At 10:01 pm, "FPS and ICE agents conducted a coordinated arrest operation to apprehend" Ms. Molina. *Id*.

The Statement of Probable Cause does not provide any explanation as to what occurred in the nearly two-hour period after the warnings were given, before officers arrested Ms. Molina. In video footage from the evening, Ms. Molina can be seen briefly standing on the public sidewalk with a small group of protesters in front of the ICE building. Exhibit B, Video of Incident and Arrest on July 20, 2025.[2] More than a dozen officers stand at the end of the driveway facing the protesters. *Id*. The video does not show any vehicles attempting to enter or exit the driveway. Without stepping onto the driveway, Ms. Molina begins to turn around and walk away from the driveway towards the street, before several officers run towards her from multiple directions and tackle her, knocking over several other protesters in the process. *Id*. It appears that officers used

---

[2] Counsel will provide a physical copy of the video Exhibits to the Court upon filing.

pepper balls and pepper spray during the arrest—protesters are wiping their eyes, and remnants of pepper-balls appear on the ground nearby. *Id*. Ms. Molina was brought back into the ICE facility, held in a detention cell, and then cited and released. *Id*; Ex. A.

Second, on July 28, 2025, Ms. Molina was again arrested and cited for failing to obey a lawful order. *See* Exhibit C, Federal Protective Services (FPS) Violation Notice, Citation No. E1763433, Pg. 2 (Statement of Probable Cause). Video footage from the afternoon of Ms. Molina's arrest shows her standing at the edge of the driveway speaking into a microphone. Exhibit D, Video of Incident and Arrest on July 28, 2025. As Ms. Molina is speaking, several other individuals briefly step onto the driveway. *Id*. Again, there is no indication that any vehicles are attempting to enter or exit the driveway. Just before her arrest, Ms. Molina takes several steps backwards, off the driveway and onto the public sidewalk, but continues speaking into the microphone. *Id*.  Four officers then walk out of the ICE facility, grab Ms. Molina, and bring her back into the facility where she was held in a detention cell before again being cited and released. *Id*.

Third, on August 21, 2025, officers again arrested Ms. Molina for failing to comply with lawful directions. *See* Exhibit E, Federal Protective Services (FPS) Violation Notice, Citation No. 1763400, Pg. 2 (Statement of Probable Cause). This time, video footage shows Ms. Molina standing on the public sidewalk as officers are walking back into the ICE facility. Exhibit F, Video of Incident and Arrest on July 28, 2025. The video shows a handful of other individuals on the public sidewalk peacefully protesting. *Id*. Ms. Molina briefly stepped onto a platform next to the public sidewalk, before stepping back onto the sidewalk. *Id*. As she stood on the platform, Ms. Molina wrapped herself in a tapestry depicting the Aztec calendar, a symbol that Ms. Molina chose in recognition of Oregon's Native history and her own opposition to the government's

Page 4 Motion to Dismiss

removal of individuals from their native home. Soon after, more than a dozen officers rushed towards Ms. Molina from multiple angles, including several who ran out of a side door and grabbed Ms. Molina. *Id*. During the arrest, one of the officers can be seen firing projectiles in the air towards the protesters. *Id*. There were also several bright flashes of light, suggesting that the officers may have used flash bangs. *Id*.

## ARGUMENT

**I.      The regulation Ms. Molina is charged with violating is being applied in violation of her First Amendment rights and thus the citations must be dismissed.**

The First Amendment provides strong speech protections for citizens: the government "shall make no law… abridging the freedom of speech." U.S. Const. amend. I. Even when a person's First Amendment activity falls within the scope of a criminal offense, courts are still "required to assess the constitutional impact of its application." *Brown v. Louisiana*, 383 U.S. 131, 142 (1966). Courts must ensure the law is not written so broadly or so imprecisely that it chills protected expression or invites arbitrary enforcement. *See City of Houston v. Hill*, 482 U.S. 451, 461 (1987); *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972); *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973). A statute is overbroad when it sweeps within its reach a substantial amount of protected speech relative to its legitimate scope. Additionally, courts must evaluate a law to ensure it is not being "deliberately and purposefully applied solely to terminate the reasonable, orderly, and limited exercise of the right to protest," as such government action "is intolerable under our Constitution." *Id*.

Ms. Molina was engaged in First Amendment protected activity. As such, the regulation charged violates Ms. Molina's First Amendment rights in three critical ways. First, the government's arrest of Ms. Molina constituted an unreasonable time, place, and manner

Page 5 Motion to Dismiss

restriction on her speech in a public forum. Second, as applied to Ms. Molina, the regulation is overbroad because it criminalized Ms. Molina's protected First Amendment activity. Third, the regulation charged is unconstitutionally vague because it allows for subjective and arbitrary enforcement, which has a chilling effect on protected speech.

> **A.      As a preliminary issue, Ms. Molina's conduct underlying the alleged offenses is protected First Amendment activity.**

When challenging the constitutionality of a statute as applied, the defendant must demonstrate that their actual conduct was constitutionally protected under the First Amendment. *See Bd. of Trs. of State Univ. of New York v. Fox*, 492 U.S. 469, 482-84 (1989). This requires analyzing whether the speech and conduct at issue were, themselves, protected categories.

Protesting falls squarely under the protection of the First Amendment. *United States v. Grace*, 461 U.S. 171, 176 (1983) ("There is no doubt that as a general matter peaceful picketing and leafletting are expressive activities involving 'speech' protected by the First Amendment."). Moreover, political speech is the most protected type of speech and is "entitled to robust protection under the First Amendment." *Citizens United v. FEC*, 558 U.S. 310, 480 (2010) (Thomas, J., concurring).

Each time Ms. Molina was arrested, she was engaged in protected First Amendment activity. On the evening of her first arrest, Ms. Molina was gathered with several other protesters on the road in front of the ICE facility. On the second occasion, again in front of the ICE building, she was using a microphone and speaker to voice her opposition to ICE practices. Finally, on the night of her third arrest, Ms. Molina was once again standing with protesters in front of the ICE facility, displaying an Aztec calendar to symbolize her moral opposition to the separation of families that resulted from immigration enforcement. In all three of these cases,

Page 6 Motion to Dismiss

Ms. Molina was exercising her right to protest and voice her opposition to the government, meaning her conduct was protected under the First Amendment.

> **B.    The government's arrest of Ms. Molina constituted an unreasonable time, place, and manner restriction on her speech in a public forum.**

Because Ms. Molina was engaged in protected First Amendment activity at the time of her arrests, it is necessary to determine whether it occurred in a public forum, a designated public forum, or a nonpublic forum. *United States v. Grace*, 461 U.S. 171, 177 (1983). This is because traditional public fora—including streets, sidewalks, parks, and certain areas generally open to the public—are provided the most robust protections under the First Amendment, while restrictions on speech activity in nonpublic fora are assessed under a less stringent standard. *See Perry Educ. Ass'n v. Perry Local Educator's Ass'n*, 460 U.S. 37, 46 (1983).

Ms. Molina's expressive First Amendment activity occurred on the driveway of the ICE facility and the surrounding streets and sidewalks, all of which are traditional public fora. The streets and sidewalks surrounding the ICE building should be "considered, generally without further inquiry, to be public forum property." *Grace*, 461 U.S. at 179. Further, the driveway of the ICE building itself is a public forum because it has the "characteristics of public sidewalks traditionally open to expressive activity." *United States v. Kokinda*, 497 U.S. 720, 725, 727 (1990).

The ICE building is generally open to the public as a federal building. Although allowing members of the public to access government property does not end the public forum inquiry altogether, it is an important factor the court must consider. *Grace*, 461 U.S. at 178. The court must also consider descriptive factors related to the property, including policies and practices related to public access to the property, the nature and characteristics of venue, the historical use

Page 7 Motion to Dismiss

of the forum, and whether anything distinguishes the property from other areas which would otherwise be clear public forums. *See id.* at 179-80; *Kokinda*, 497 U.S. at 727; *Perry Educ. Ass'n*, 460 U.S. at 45.

Here, the area outside the ICE building is used by members of the public who are passing by or who are waiting for appointments. On either side of the driveway there are concrete structures that appear to be benches, inviting the public to sit. Because expressive First Amendment activity on the driveway of the ICE building is compatible with the normal uses of the ICE building when the driveway is not occupied by vehicles, the property should be considered a public forum. *See Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 803 (1985); *see also Kuszynski v. City of Oakland*, 479 F.2d 1130, 1131 (9th Cir. 1973) (explaining that an ordinance limiting the "dissemination of ideas in a public place," the airport, must be justified by the needs of the airport).

In a public forum, the government may pass reasonable time, place and manner restrictions on speech, but the government's blanket exclusion of Ms. Molina from the forum goes far beyond that. "Speakers can be excluded from a public forum only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest." *Cornelius*, 473 U.S. at 800. Here, officers issued sweeping orders directing protesters to leave the driveway and surrounding areas. *See* Exhibit A, Pg. 2 (Statement of Probable Cause) (officers directed "all demonstrators" to "stay off federal property"); *See* Exhibit C, Pg. 2 (Statement of Probable Cause) (officers directed protesters to "leave **the area** or face arrest."); Indeed, it appears that the government expected this order to have an indefinite timeframe, such that any time Ms. Molina returned to the driveway, she was in violation. *See* Exhibit A, Pg. 2 (describing warnings given to Ms. Molina two hours before she was arrested). Because the

Page 8 Motion to Dismiss

government sought to exclude Ms. Molina from the forum completely and indefinitely, the government must justify the exclusion with a compelling state interest, and the exclusion must be narrowly drawn to achieve that interest. *Cornelius*, 473 U.S. at 800.

Here, Ms. Molina's exclusion from the driveway in front of the ICE building is not a narrowly drawn restriction on speech that furthers a compelling government interest because the application of the regulation restricting this speech had an "insufficient nexus" with any government interest. *See Grace*, 461 U.S. at 181. Ms. Molina did not actually obstruct the use of the ICE building or the driveway itself, deface or damage the property, or otherwise impede the function of the ICE building on any of the three occasions she was arrested. *See Texas v. Johnson*, 491 U.S. 397, 407 (1989) (providing that if an asserted government interest is not implicated by the facts before the court, that interest is not considered in the analysis). As such, excluding Ms. Molina from the property entirely was an unconstitutional restriction on Ms. Molina's First Amendment protections.

Even if the Court finds that the conduct at issue occurred in a nonpublic forum, the government's restrictions on Ms. Molina's speech were not justified. If the protected activity occurred in a nonpublic forum, courts apply the least exacting standard of judicial scrutiny and only require that the restrictions on speech "are reasonable in light of the use to which the [property is] dedicated and that there is no discrimination on the basis of content." *Id.* at 178; *see also Kokinda*, 497 U.S. at 725 ("The Government, even when acting in its proprietary capacity, does not enjoy absolute freedom from the First Amendment."). Here, Ms. Molina was engaged in protected First Amendment activity and even if that conduct took place in a nonpublic forum, the

government cannot demonstrate that its application of the regulations charged was reasonable and content neutral.

### C.      The regulation is unconstitutionally overbroad as applied because it was enforced against Ms. Molina's protected First Amendment activity.

The Constitution protects against overbroad laws which "chill speech within the First Amendment's vast and privileged sphere." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 244 (2002). Overbreadth challenges may be brought against regulations that "delegate[] standardless discretionary power to local functionaries, resulting in virtually unreviewable prior restraints on First Amendment rights." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973). If a statute covers both conduct and speech, the Supreme Court requires that the "overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Id*. at 615. Unique to First Amendment overbreadth arguments is that defendants are "permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973). Because the regulation in this case was enforced against protected activity, it is unconstitutionally overbroad as applied.

Here, agents allege that the precipitating conduct was Ms. Molina's mere presence on federal property, expressing her views in opposition to ICE. Other individuals were standing in the same area as Ms. Molina, but agents specifically sought her out and quelled her speech. This is precisely the "standardless discretionary power" that the First Amendment protects against. *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973). Because the agents used the regulation to

arbitrarily criminalize Ms. Molina's protest activity, it is unconstitutionally overbroad, and all three of Ms. Molina's citations should be dismissed.

### D.    The regulation charged is void because it is unconstitutionally vague.

Any criminal offense must be defined with "sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). There are two principles underlying this doctrine. First, the principle of fair notice—citizens must be informed which conduct is prohibited. *See Smith v. Goguen*, 415 U.S. 566, 574 (1974). Second, criminal offenses must "establish minimal guidelines to govern law enforcement," to keep "policemen, prosecutors, and juries [from pursuing] their personal predilections." *Id.* Important here, where the scope of an offense, as written, "is capable of reaching expression sheltered by the First Amendment, the doctrine demands a greater degree of specificity than in other contexts." *Id.* at 573.

The regulation charged here is unconstitutionally vague because, by its terms, it can regulate First Amendment activity and does not provide sufficient specificity to inform citizens what conduct is prohibited. *See id.* The regulation provides: "Persons in and on property must at all times comply with official signs of a prohibitory, regulatory, or directory nature and with the lawful direction of Federal police officers and other authorized individuals." 41 C.F.R. § 102-74.385 (2025). Two provisions of this regulation are vague and do not adequately provide standards for law enforcement to avoid arbitrary enforcement: (1) the provision requiring compliance with "lawful direction"; and (2) the provision requiring compliance with orders given by "other authorized individuals."

First, the provision requiring compliance with "lawful direction" is unconstitutionally vague because it provides no guiding principles as to what renders a direction "lawful." It is unclear whether a direction is lawful due to the manner in which it is given or whether it is lawful in that its substance is supported by existing law. The trouble with the former reading is overwhelming lack of clarity. This lack of clarity is demonstrated in *United States v. Huizar*, where the court reversed a conviction under this regulation because the direction given was not constitutionally sufficient. 762 Fed.Appx. 391, 392 (9th Cir. 2019). There, the court explained that "basic principles of due process" required any "lawful direction" to contain "all, or many" of the following qualities: an unambiguous command, often given multiple times; officers ensured the command was adequately understood; officers explained that failing to comply with the order would result in arrest; and officers gave defendants a "reasonable opportunity to comply." *Id.* (collecting cases).

Even with the Ninth Circuit's somewhat-limiting principle, it remains unclear to both officers and citizens what constitutes a "lawful direction." If the regulation instead suggests that a "lawful direction" is only lawful when it is substantively supported by existing law, again it does not provide sufficient notice to citizens or guiding principles to law enforcement. In *Smith*, the Court found a Massachusetts statute void for vagueness because it did not define "with substantial specificity what constitutes forbidden treatment of the flag." 415 U.S. at 581-82. There, it was important to the Court that American flags are common and come in many forms that change from generation to generation. Just like *Smith*, the regulation at issue here simply requires compliance with "lawful directions," notwithstanding the fact that the lawfulness of directions is subject to constantly changing standards found in statutes, regulations, and caselaw.

For these same reasons, the second provision, requiring compliance with "authorized individuals," is unconstitutionally vague.

Although this District has addressed void-for-vagueness challenges to this and similar regulations, these cases focus primarily on only one aspect of the void-for-vagueness doctrine: notice to citizens. *See, e.g.*, *United States v. Cruscial*, 2019 WL 1087150, *4 (D. Or. Mar. 7, 2019); *United States v. Mumford*, 2017 WL 652449, *4 (D. Or. Feb. 16, 2017). However, an important aspect of this doctrine, especially when an offense purports to regulate potentially constitutionally protected First Amendment activity, is whether there is sufficient guidance to those enforcing the laws. *See Smith*, 415 U.S. at 573-74. Because this regulation fails to provide federal officers or other "authorized individuals" with any direction as to what makes an order "lawful," it gives too much discretion to those enforcing this offense and implicates one main concern a void-for-vagueness challenge: arbitrary enforcement of the law. *See id.*; 41 C.F.R. § 102-74.385.

## II.    The statute authorizing the General Services Administration to promulgate the charged regulation is an unconstitutional delegation of legislative power by Congress.

As a matter of law, the charges should be dismissed because the regulation on which they are based were promulgated in violation of the separation of powers principle, after Congress impermissibly delegated to the executive branch the power to enact and enforce a criminal code without providing an intelligible principle to constrain the exercise of that power. "If the separation of powers means anything, it must mean that the prosecutor isn't allowed to define the crimes he gets to enforce." *United States v. Nichols*, 784 F.3d 666, 670 (10th Cir. 2015) (Gorsuch, J., dissenting from denial of rehearing en banc).

Here, the regulation under which Ms. Molina was charged purport to be promulgated pursuant to 40 U.S.C. § 1315(c), in which Congress delegated to the Department of Homeland Security authority to promulgate regulations for the protection and administration of federal property and to impose "reasonable" sanctions of up to 30 days in jail for violations of the regulations. The delegated authority was unconstitutional, and charges based on that authority must be dismissed.

A. **The separation of powers doctrine protects against the concentration of power within one branch of government by limiting the delegation of legislative authority to executive agencies.**

Article I of the Constitution vests all legislative powers in the Congress. U.S. Const., Art. I, § 1. From this language, the Supreme Court has derived the nondelegation doctrine: that Congress may not constitutionally delegate its legislative power to another branch of Government. *Touby v. United States*, 500 U.S. 160, 165 (1991). This nondelegation doctrine is "rooted in the principle of separation of powers that underlies our tripartite system of Government." *Mistretta v. United States*, 488 U.S. 361, 371 (1989). The separation of powers prevents the aggrandizement of power within any single branch. *See I.N.S. v. Chadha*, 462 U.S. 919, 998 (1983) (noting "the purpose of separating the authority of government is to prevent unnecessary and dangerous concentration of power in one branch").

Despite the nondelegation doctrine, Congress may seek assistance, "within proper limits," from the other branches of government when legislating. *Touby*, 500 U.S. at 165. That is, broadly worded directives to executive agencies are permissible if they provide sufficient guidance:

> Congress does not violate the Constitution merely because it legislates in broad terms, leaving a certain degree of discretion to executive or judicial actors. So long as Congress "lay[s] down by legislative act an intelligible principle to which

Page 14        Motion to Dismiss

the person or body authorized to [act] is directed to conform, such legislative action is not a forbidden delegation of legislative power."

*Id.* (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)); *see also Mistretta*, 488 U.S. at 372-73 (noting it will be "constitutionally sufficient if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority").

When Congress seeks to delegate its power to enact criminal rules, greater specificity in the delegation may be required. *See, e.g.*, *United States v. Pheasant*, 157 F.4th 1119, 1120 (9th Cir. 2025) (Bumatay, J. dissenting) (arguing that criminal law requires a "more demanding" approach to non-delegation, and that Congress "must—at a minimum—define both the actus reus and the penalty for any criminal offense"); *Touby*, 500 U.S. at 166 (questioning but not deciding whether greater specificity in delegation is required in the context of criminal sanctions); *United States v. Amirnazmi*, 645 F.3d 564, 576-77 (3d. Cir. 2011) (upholding a statute that delegated to the President authority to create criminal sanctions for certain exports because the delegation restricted the scope of exports covered, imposed a mens rea requirement, and otherwise "meaningfully constrain[ed]" the President's discretion); *United States v. Dhafir*, 461 F.3d 211, 216-17 (2d. Cir. 2006) (same).

**B.     The charged regulation is invalid because Congress impermissibly delegated to the executive branch unconstrainted authority to impose criminal penalties.**

The regulation under which Ms. Molina is charged, 41 C.F.R §§ 102-74.385, was promulgated pursuant to 40 U.S.C. § 1315(c). *See, e.g.*, *Baldwin*, 745 F.3d at 1030 (tracing "congressional pedigree" of § 102-74.385). Congress's delegation of this rule-making authority to the Executive Branch violated the Constitution because the delegation lacked specificity and

failed to provide an intelligible principle to guide and constrain the Department of Homeland Security's exercise of legislative power. Authorizing an agency to promulgate criminal regulations for the "protection and administration" of property and persons, without more, invites abuse of power. *Cf. Nichols*, 784 F.3d at 673 ("[T]he framers' attention to the separation of powers was driven by a particular concern about individual liberty and even more especially by a fear of endowing one set of hands with the power to create and enforce criminal sanctions.") (Gorsuch, J., dissenting). There is no limit on the scope of actions on federal property that can be regulated under this delegation, no required mens rea for any violation, and no requirement for consultation with Congress.[3] Thus, § 1315(c) violates the non-delegation doctrine because it fails to establish meaningful constraints on the Executive's discretion.

In *Nichols,* Justice Gorsuch—then a judge—distilled from *Touby* three limiting principles for congressional delegation of criminal authority:

> (1) Congress must set forth a clear and generally applicable rule (unauthorized persons may not possess the drug) that (2) hinges on a factual determination by the Executive (does the drug pose an imminent hazard?) and (3) the statute provides criteria the Executive must employ when making its finding (does the drug in question currently have an accepted medical use?).

*Nichols*, 784 F.3d at 673 (Gorsuch, J., dissenting). The court noted that these "three criteria could easily be applied to most any delegation challenge in the criminal context." *Id.* Congress's delegation of authority to the Department of Homeland Security that resulted in the challenged regulation in this case falls far short of the specificity required by *Touby*. The delegation can be

---

[3] Indeed, the regulations promulgated pursuant to § 1315(c) cover a broad scope of activity—breastfeeding, conducting a lottery or pool, soliciting alms—that might not be expected under a Congressional delegation to protect and administration of federal property. 41 C.F.R. §§ 102-74.426, 102-74.395, 102-74.410.

construed to set out a goal in the broadest sense of the term (the protection and administration of federal property and persons thereon), but offered no rule or limiting principle to guide the conferred discretion. The delegation requires no fact-finding and suggests no criteria that the Executive must use.

The principle that Congress may not delegate legislative power to the President is "universally recognized as vital to the integrity and maintenance of the system of government ordained by the Constitution." *Marshall Field & Co. v. Clark*, 143 U.S. 649, 692 (1892); *see also Amirnazmi*, 645 F.3d at 574 (quoting this principle). Although cumbersome, the separation of powers serves important goals:

> Without a doubt, the framers' concerns about the delegation of legislative power had a great deal to do with the criminal law. The framers worried that placing the power to legislate, prosecute, and jail in the hands of the Executive would invite the sort of tyranny they experienced at the hands of a whimsical king. Their endorsement of the separation of powers was predicated on the view that ''[t]he inefficiency associated with [it] serves a valuable'' liberty-preserving ''function, and, in the context of criminal law, no other mechanism provides a substitute.''

*Nichols*, 784 F.3d at 670 (Gorsuch, J., dissenting) (internal citation omitted). The delegation resulting in the criminal regulation in this case failed to provide the guidance and limits on executive discretion required by the Supreme Court in *Touby*. This Court should find the regulation unconstitutional and order the charges dismissed.

## CONCLUSION

For the foregoing reasons, Ms. Molina respectfully requests that the Court dismiss the charges. To the extent that there are any disputed issues of fact are necessary for the Court's decision, Ms. Molina respectfully requests that the Court conduct an evidentiary hearing to make factual findings pursuant to Federal Rule of Criminal Procedure 12. *See United States v. Prieto-Villa*, 910 F.2d 601, 606-10 (9th Cir. 1990).

Page 17      Motion to Dismiss

Dated: March 31, 2026.

*s/ Ellie Riegel*
Ellie Riegel, OSB #221879

*s/ Peyton Lee*
Peyton Lee, OSB #164224
